### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | |
|---|---|
| CALVIN L. STARKS, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) **Case No. 1:23-cv-00439-SLC** |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, *sued as Leland Dudek,* | ) |
| *Acting[1] Commissioner of the Social* | ) |
| *Security Administration,* | ) |
| | ) |
| **Defendant.** | ) |

### <u>OPINION AND ORDER</u>

Plaintiff Calvin L. Starks appeals to the district court from a final decision of the
Commissioner of Social Security ("Commissioner") denying his application under the Social
Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security
Income ("SSI"). (ECF 1).[2] For the following reasons, the Commissioner's decision will be
AFFIRMED.

### I. FACTUAL AND PROCEDURAL HISTORY

Starks applied for DIB and SSI in February 2019, alleging disability as of December 13,
2017. (ECF 9 Administrative Record ("AR") 81, 838; *see* AR 294-97).[3] Starks's claim was

---

[1] Leland Dudek became the Acting Commissioner of Social Security on February 16, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Leland Dudek is substituted for Martin O'Malley as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g). *See, e.g., Michael A. C. v. Dudek*, No. 1:22-cv-5422, 2025 WL 552464, at *1 n.1 (N.D. Ill. Feb. 19, 2025).

[2] The parties have consented to the exercise of jurisdiction by a Magistrate Judge. (ECF 12, 13).

[3] The AR page numbers cited herein correspond to the ECF-generated page numbers displayed at the top center of the screen when the AR is open in ECF, rather than the page numbers printed in the lower right corner of each page.

denied initially and upon reconsideration. (AR 228-30, 241-42). On June 11, 2020, administrative law judge ("ALJ") William Pierson conducted an administrative hearing at which Starks—who was represented by counsel—and a vocational expert, testified. (AR 102-65). On August 12, 2020, the ALJ rendered an unfavorable decision to Starks, concluding that he was not disabled because, despite the limitations caused by his impairments, he could perform jobs that exist in significant numbers in the national economy. (AR 81-96). The Appeals Council denied Starks's request for review on June 16, 2021 (AR 859-62), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

On August 19, 2021, Starks filed a complaint in federal court, appealing the Commissioner's denial of disability benefits. (AR 866-70; *see* AR 5). On May 19, 2022, the matter was remanded after a timely appeal to the District Court for the Northern District of Indiana. (AR 897-906). Notably, the Court directed the ALJ to consider whether the evidence supports the ALJ's finding that (1) Starks did not need a cane, (2) Starks's mental impairments be excluded from the residual functional capacity ("RFC"), and (3) more restrictive (neck) flexion and manipulative (hand) restrictions in the RFC are not needed. (*Id.*). On remand, ALJ Pierson conducted the second administrative hearing on April 13, 2023, at which Starks—who was represented by counsel—and a vocational expert, testified. (AR 784-834). On June 21, 2023, the ALJ rendered another unfavorable decision to Starks, concluding that he was not disabled because, despite the limitations from his impairments, he was capable of performing work that exists in significant number in the national economy. (AR 747-74).

Starks filed a complaint with this Court on October 16, 2023, seeking relief from the Commissioner's decision. (ECF 1). In his appeal, Starks alleges that a remand is necessary because the ALJ: (1) failed to include in the RFC the need for a cane and otherwise failed to

consider his impairments in combination; (2) failed to include in the RFC the need for limitation on Starks's ability to look up and down; (3) failed to include Starks's mental limitations in the RFC, thus failing to build a logical bridge from the evidence to the conclusion related thereto; and (4) violated Starks's constitutional right of procedural due process at the administrative hearing. (ECF 21 at 11-31).

At the time of the ALJ's June 21, 2023, decision, Starks was 36 years old (AR 772); had a high school education (*id*.); and had past relevant work as a Drill Press Operator, Stock Selector, Wire Worker, Wire Harness Assembler, Circuit Board Solderer, and a Machine Packager (*id*.). In his application, Starks alleged disability due to a December 2017 motor vehicle accident ("MVA") (restrained passenger), an April 2021 car accident, chronic pain syndrome, radiculopathies, fibromyalgia, "facet arthropathic", degenerative changes and disc disease of the spine, a right knee meniscal tear, anxiety, and depression. (AR 1139).

## II. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . , with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation and quotation marks omitted). The decision will be reversed "only if [it is] not supported by substantial evidence or if the Commissioner applied an erroneous legal standard." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

3

To determine if substantial evidence exists, the Court "review[s] the entire administrative record, but do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Id.* (citations omitted). "Rather, if the findings of the Commissioner . . . are supported by substantial evidence, they are conclusive." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

### III. Analysis

#### *A. The Law*

Under the Act, a claimant seeking DIB or SSI must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also id.* §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed in substantial gainful activity, (2) whether he has a severe impairment, (3) whether his impairment is one that the Commissioner considers conclusively disabling, (4) whether he is incapable of performing his past relevant work, and (5) whether he is incapable of performing any work in the national economy. *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001);

4

*see also* 20 C.F.R. §§ 404.1520, 416.920.[4] "[A]n affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled." *Zurawski v. Halte*r, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). "A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Id*. (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The Commissioner's Final Decision

In the ALJ's June 21, 2023, decision, which became the final decision of the Commissioner, the ALJ observed at the outset that Starks was insured for DIB through December 31, 2021. (AR 750).[5] At step one of the five-step analysis, the ALJ noted that Starks did not engage in substantial gainful activity since his alleged onset date of December 13, 2017. (*Id*.). At step two, the ALJ found that Starks had the following severe impairments: chronic pain syndrome, radiculopathies, facet arthropathy, degenerative changes and disc disease of the spines, and a right knee meniscal tear as of February 2019. (*Id*.). At step three, the ALJ concluded that Starks did not have an impairment or combination of impairments severe enough to meet or equal a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 756-57).

The ALJ assigned the following RFC:

> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: The claimant is limited to lifting, carrying, pushing and pulling ten pounds frequently and 20 occasionally. The claimant can sit at least six hours in an eight hour work day and stand and/or walk six hours in an eight hour work day. The claimant should not climb

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks he can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. *Id*. §§ 404.1520(e), 416.920(e).

[5] For purposes of his DIB claim, Starks must establish that he was disabled as of his date last insured, December 31, 2021. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (explaining that a claimant must establish that she was disabled as of her date last insured in order to recover DIB).

> ropes, ladders or scaffolds. The claimant can occasionally kneel, crouch, and crawl. [The] claimant can occasionally bend and stoop in addition to what is required to sit. The claimant can occasionally use ramps and stairs. The claimant should not work upon wet, slippery, moving or uneven surfaces. The claimant can perform the balance required of such activities. The claimant should avoid work within close proximity to open and exposed heights and open and dangerous machinery such as open flames and fast moving exposed blades.

(AR 757).

The ALJ determined at step four that, given the foregoing RFC, Starks could not perform any of his past relevant work. (AR 772). However, at step-five, the ALJ concluded Starks could perform a significant number of unskilled, light jobs in the national economy, including, housekeeping cleaner, inspector hand packager, and office helper. (AR 773). Therefore, Starks's applications for DIB and SSI were denied. (AR 774).

*C. Physical RFC*

Starks's first argument on appeal is that the ALJ erred when he failed to include his need for a cane in the RFC; and otherwise failed to consider impairments in combination. (ECF 21 at 6).

<u>1. Cane Usage</u>

As another district court in the Seventh Circuit has observed, "[t]he [Social Security Administration] has issued a ruling specifically addressing finding canes or hand-held assistance devices medically necessary." *Henry W. G. v. Kijakazi*, No. 3:22-cv-00133-MPB-CSW, 2023 WL 6349418, at *2 (S.D. Ind. Sept. 29, 2023) (referencing SSR 96-9p).

> To find that a hand-held assistance device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).

SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996). The Seventh Circuit Court of Appeals has

articulated SSR 96-9p's application to the facts of social security cases. *See e.g., Tripp v. Astrue*,

489 F. App'x 951, 955 (7th Cir. 2012) ("In our view, the record adequately supports the finding

of no medical necessity [for a cane]. The record is replete with references to Tripp's use of

'crutches,' 'a crutch,' or 'a cane,' but these mentions are traceable to his self-reports and to

physicians' observations that he *presented* with an assistive device.").

      In *Tripp*, 489 F. App'x at 955, the court indicated that a medical provider's

documentation regarding the claimant's need for an ambulatory device be specific enough so that

the Court can "determine whether this was the doctor's *medical* opinion or merely a restatement

of what was told to [the medical provider] by [the claimant]." *Id*.[6] Conversely, the Seventh

Circuit Court of Appeals found that an ALJ failed to address a claimant's need for a cane where

a doctor's notes described repeated falls by the claimant, the doctor provided a prescription for a

cane, and "most concerning, the presence of the cane at Thomas's hearing and her testimony

about why she needed it." *Thomas v. Colvin*, 534 F. App'x 546, 550 (7th Cir. 2013). The

commissioner in that case defended the ALJ's ruling, reasoning that "the ALJ said enough to

adequately address Thomas's alleged need for a cane because he found her testimony not fully

credible and accepted Dr. Bilinsky's physical RFC assessment, which left blank a box that asked

if Thomas required a hand-held assistive device." *Id*. However, the court found that the ALJ

should have addressed why Thomas's reported limitations were or were not consistent with the

---

[6] The court opined on a medical report discussing the claimant's cane usage stating:

> Even the statement of Dr. Motiani, who in his letter to the state agency asserted matter-of-
> factly that Tripp "does need a crutch," lacks the specificity necessary to determine whether
> this was the doctor's *medical* opinion or merely a restatement of what was told to him by
> Tripp. Dr. Motiani, after all, saw Tripp only once, offered an opinion without conducting any
> diagnostic tests, and has no expertise in orthopaedics.

*Id.*.

evidence in the record. *See id.* (referencing SSR 96-8p). Further, "rel[iance] on Dr. Bilinsky's assessment and generally discrediting [of] Thomas's testimony without addressing her reliance on a cane did not satisfy that obligation or build the requisite 'logical bridge' between the evidence and the ALJ's conclusions." *Id.* (citation omitted). Saliently, the court elucidated that the issue was not that the ALJ was required to find, through the medical evidence, that the claimant required a cane, but rather, the ALJ "failed to consider the issue at all . . . ." *Id.*

"[W]here there is unequivocal medical opinion or evidence for the need of an assistive device, then the ALJ must confront the evidence . . . ." *Collett-Brown v. Saul*, No. 1:19-cv-00170 DRL-SLC, 2020 WL 1685717, at *8 (N.D. Ind. Apr. 6, 2020) (citing *Thomas*, 534 F. Appx. at 550). "[A]n ambiguous [medical] opinion or evidence about the need for an assistive device may require follow up [from the ALJ]." *Id.* (citing *Tripp*, 489 F. Appx. at 955); *see Miller v. Berryhill,* No. 1:16-cv-00122-SLC, 2018 WL 2316180, at *4 (N.D. Ind. May 22, 2018) ("An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable." (quoting *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004)).[7]

As a threshold matter, the ALJ noted that the remanding opinion included Starks's argument that the RFC should have included an assistive device. (AR 766). But the ALJ further observed that the medical file at the time of the prior ALJ's decision contained treatment notes up to mid-year 2019, meaning that the documentation supporting Starks's cane usage would be a maximum of six months. (*Id.*). The ALJ noted that this six-month duration did not meet the twelve-month durational requirement for inclusion into the RFC. (*Id.*); *see* 20 C.F.R. §§

---

[7] The present case is distinguished from this Court's Opinion in *Miller*, given that case did not concern conflicting medical evidence that a cane was not a medical necessity nor was there discussion of the durational period, as will be elaborated on later in this Opinion. *See id.*

404.1509, 416.909 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months. We call this the duration requirement.").

The ALJ further observed that Starks's cane usage was inconsistent, that he made contradicting statements about his cane usage, and that the medical notes did not consistently support a need for a cane. (*See generally* AR 758-69; *see also* AR 794-95).[8] Notably, Starks stated "that he was not using a cane 'at all' until he injured his knee in 2019." (AR 758 (quoting AR 794)). The ALJ pointed out that Starks's alleged onset date was December 13, 2017, which was catalyzed by a car accident-causing pain in his cervical spine, posterior neck, and mid-thoracic spine. (AR 759; *see* AR 425-38). "However, [Starks] remained neurovascularly intact, ambulated with a steady gait, walked without assistance, and moved all of his extremities" after the accident. (AR 759*; see* AR 427). Therefore, the ALJ analyzed Starks's purported need for a cane based on his right knee injury in February 2019—not his back and neck related injuries in December of 2017. (AR 759). The ALJ did, however, assess Starks's cane use in combination with his neck, back, leg, and mental related treatment appointments. (*See generally* AR 757-72).

The ALJ tracked the documented instances in which Starks relied on a cane. (*See* AR 761-66). Starks slipped and fell on ice February 11, 2019, but a February 2019 medical opinion reflected that the right knee did not show any acute fracture or dislocation. (AR 761; *see* AR 632-33). And while Starks requested crutches at a primary care appointment in February of 2019 (AR 761; *see* AR 629), that same day at an orthopedic appointment for his right knee, an

---

[8] "[O]bviously administrative law judges will . . . assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (discussing the difference between an ALJ's impermissible impeachment attack on a claimant and an ALJ's power to assess the credibility of a claimant's pain assertion).

ambulatory aid was neither used or recommended. (AR 761; *see* AR 644-45). At a May 10, 2019, appointment, again no ambulatory aid was recorded. (AR 762; *see* AR 695-96).[9]

The ALJ also reviewed medical documents, tracking the degree of injury sustained to the right knee and Starks's response to medical consultation. At one February 2019 appointment, the right knee did not show any acute fracture or dislocation though the medical professional noted the "a patellar tendon injury is difficult to entirely exclude." (AR 761; *see* AR 632). A February 27, 2019, appointment documented that Starks had "no difficulty with knee extension and overall quad strength," but a knee brace was mentioned in conjunction with physical therapy. (AR 761; *see* AR 645). During an April 24, 2019, appointment, Starks's right quad strength was a 4/5 and right hamstring strength was a 5/5. (AR 761; *see* AR 642). A May 7, 2019, knee appointment found that there could be a "medial meniscal tear in the posterior horn" but there was no fracture or bone contusion. (AR 761; *see* AR 639). At a May 10, 2019, appointment, there was moderate tenderness in the anterior patellar tendon and medial joint line, but right quad strength was, again, a 4/5 and right hamstring strength was a 5/5. (AR 762; *see* AR 696). Although Starks was given the option to undergo surgery,[10] and initially agreed with the proposal, he never went through with the treatment recommendation. (AR 762; *see* AR 696).[11]

The ALJ also commented on an acute left knee injury that Starks sustained in January 2020 after falling in a puddle. (AR 763; *see* AR 1502). The ALJ noted that Starks used a

---

[9] The ALJ also indicated other times that a treating medical professional did not state Starks used a cane as it relates to his right knee injury. These instances include medical appointments at Summit Pain Management from April 2019 to July 2019. (AR 762; *see* AR 698-714).

[10] Starks was also given the option to continue physical therapy. (AR 762; *see* AR 696).

[11] The ALJ also noted that Starks chose not to follow through with surgery because there were dental issues he wanted to address before the knee surgery. (AR 758-59; *see* AR 814-15). However, dental processing claims issues and a 1.5 hour wait in the dental office deterred Starks from addressing the dental issues. (AR 758-59; *see* AR 815). Consequently, Starks decidedly never underwent the right knee surgery. (AR 758-59; *see* AR 762; *see also* AR 815).

wheelchair at an appointment on a single occasion. (AR 763; *see* AR 1502). Starks reported pain

in both knees at a July 2020 appointment, however, his left leg showed generally normal results

with 5/5 quad and hamstring strength. (AR 763; *see* AR 1496). The right knee showed some

effusion, but as stated previously, Starks declined to undergo surgery. (AR 763; *see* AR 1496).

The ALJ also reviewed an August 2020 care appointment where Starks did use a cane,

portraying an abnormal walking pattern resulting from pain. (AR 764; *see* AR 1261).

Notably, the ALJ considered a September 16, 2020, physical therapy appointment,

including the provider's opinion, that the ALJ ultimately did not find persuasive. (AR 764, 768;

*see* AR 1203-12). The ALJ viewed the physical therapist's recommendation that Starks obtain a

walker to assist with balancing, as conflicting with several other medical opinions that abstained

from such a recommendation. (AR 764; *see* AR 1212). The ALJ further reasoned:

> [T]he claimant did not even allege a need for a walker at th[e] time [of the
> appointment], nor did he have a prescribed ambulatory aide or
> recommendation to use an ambulatory aide from any treating source. Due to
> the claimant's noted subpar effort on exam, and the inconsistencies inherent
> in his own observed behaviors at exam and the inconsistencies between his
> portrayals at exam and the long term treatment notes, and the source's own
> indication that the results were only "borderline valid," the undersigned finds
> that this opinion is not persuasive.

(AR 764).

The ALJ noted that a February 2021 pain management appointment mentioned Starks's

use of a cane along with an antalgic gait. (AR 764-65; *see* AR 1255). In April of 2021, a provider

found that Starks's gait was normal, yet there was use of a cane. (AR 765; *see* AR 1515). Starks

was supposed to get an MRI for his left knee but never went. (AR 765; *see* AR 1516). The ALJ

also commented on an October 2021 left knee injury Starks sustained after a physical altercation.

(AR 765; *see* AR 1510). At one appointment in October 2021 a provider found Starks's left knee

imaging showed no fracturing or dislocation and that his soft tissue imaging was unremarkable.

(AR 1524).[12] During another appointment in October 2021 a provider observed that Starks did use a cane. (AR 765; *see* AR 1511). Contrarily, the ALJ noted that a provider in November 2021 found, through an MRI, that Starks's left knee sustained an injury suggesting "patellar tendon-lateral femoral condyle friction syndrome." (AR 765; *see* AR 1533). As of December 2021, Starks had 4/5 strength in his lower extremities. (AR 765; *see* AR 1527, 1529). The ALJ noted that the latest medical documentation relevant to Starks's cane usage was in February of 2022, when a doctor commented: "[I]t is not clear why he is using a cane[;] he does have some back issues and some neck issues but that [ha]s been deemed to be nonsurgical . . . ." (AR 768 (quoting AR 1540)). Summarizing this evidence, the ALJ stated:

> Between July 2020 and early 2022, antalgic gait and cane use was documented at some visits, and not at others. It appeared to occur more often with acute injuries or exacerbations. The records do not document consistent need or use of a cane or other aide for any 12 month period. Further, even when the claimant was noted to use the cane, no treating medical provider specifically recommended or prescribed the cane. Further, one orthopedic specialist even questioned why it was being used . . . .

(AR 767-68).

The ALJ also noted a lack of adherence to medical instructions from care providers as it pertains to Starks's pain, emanating from his leg injuries. For example, the ALJ found a July 2019 pain management appointment "[s]ignificant . . . [in] that a drug screen was actually negative for Oxycodone/Percocet, despite the fact that the claimant was prescribed the medication and he did pick up the prescription. He did not bring in his bottle for a pill count." (AR 762; *see* AR 719). This led to a discontinuance of Starks's prescription. (AR 762; *see* AR 704). Also, at a July 2020 appointment Starks admitted that "he never picked up a steroid

---

[12] The ALJ appears to have been referring to this doctor's visit when describing the imaging as "normal". (ECF 765).

prescription for joint pain." (AR 763; *see* AR 1495). Further, Starks failed to appear at three pain management visits and was dismissed from the practice, thereafter. (AR 765; *see* AR 1551).

Indeed, as the Commissioner observes, "Plaintiff discusses his treatment records from 2018 . . . but fails to identify any record indicating he required or used a cane during this period." (ECF 27 at 11-12 (citation omitted)). As the plaintiff in this matter, Starks carries the burden of proving that he is disabled. *See Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021) (stating that the plaintiff "bears the burden of proving that she is disabled" (citing 20 C.F.R. § 404.1512(a); *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017)). Consequently, Starks must prove to the Court why he requires an ambulatory device. Without providing a scintilla of evidence regarding past cane usage or medical professional recommendations to use a cane prior to 2019, Starks faults the ALJ for not mentioning that his 2017 car accident was a hit-and-run. (ECF 21 at 13). He contends hit-and-run victims are less likely to receive compensation, which could explain why he did not receive necessary healthcare at the time. (*Id*.). The Court recognizes that healthcare costs can certainly pose an impediment to proper healthcare for serious medical issues. *See e.g., Motley v. Colvin*, No. 1:15-cv-00141-JD, 2016 WL 5349496, at *5 (N.D. Ind. Sept. 26, 2016) ("[T]he ALJ erred in discrediting the testimony about Motley's physical and mental limitations based on his lack of treatment without explaining whether Motley's lack of insurance and financial means excused the deficit." (citations omitted)). However, this argument is unpersuasive for at least three reasons.

First, the ALJ discusses a time in which Starks did attain medication and chose to not take the medication, leading to a discontinuance of his prescription. (*See* AR 762; *see also* AR 704, 719). Second, Starks fails to point to any evidence citing costs as a reason Starks chose to not take medication, attend medical appointments, or undergo surgery. *See cf. Motley*, 2016 WL

5349496, at *5 ("[D]espite repeatedly citing Motley's limited treatment history and lack of medical records to support Motley's alleged restrictions, the ALJ failed to consider any explanations for the deficit. That is a notable omission, since there is abundant evidence that Motley was unable to afford treatment and medications, and that he was frustrated with his circumstances.").[13] But perhaps most importantly, the ALJ made clear that Starks failed to provide any evidence that he needed or desired a cane before February 11, 2019—arising from the ALJ questioning Starks's use of a cane at the June 2020 hearing. (AR 767; *see* 794).[14] Consequently, it was reasonable for the ALJ to cabin his analysis regarding the issue of the cane to Starks's health conditions as of February 2019—avoiding an analysis that chronicled farther back to the onset date in December of 2017, when Starks was involved in a car accident.

Here, the Court must assess whether the ALJ "fail[ed] to address [Starks's] need for a cane" in light of Starks's claims that he requires a cane, two medical opinions recommending that Starks use an ambulatory device, and other evidence in the record. *Thomas*, 534 F. App'x at 550; *see Tripp*, 489 F. App'x at 955. Unlike in *Thomas*, 534 F. App'x at 550, the ALJ here did properly address why Starks's reported limitations were, or were not, consistent with the evidence in the record. As previously mentioned in this Opinion, the ALJ considered several instances where Starks did use a cane and several other instances where Starks did not do so.

---

[13] Starks's counsel states that "[f]or probably a variety of reasons, medical care has not been reliably apparent and ready for Plaintiff" without providing any additional insight into Starks's financial circumstances that would prevent him from receiving sufficient healthcare. (ECF 21 at 12). Counsel's argument is speculative.

[14] The ALJ stated:

> In regards to allegations of a need for a cane, [Starks] testified that he started using his grandfather's cane after the February 11, 2019 [right] knee injury . . . . Although he stated that he has continued to use the cane at all times since then, this is not consistent with the totality of the evidence.

(AR 767).

(*See* AR 767-68). According to the ALJ, this inconsistent cane use conflicted with Starks's assertion that he used the cane at all times. (*See* AR 758; *see also id*. ("He testified that he could only walk about 5-6 steps without a cane before he falls over.")).[15] What is more, it appears that only two medical providers, Stephen Parker, M.D., and Kelly Jacobs, PT, each during a one-time visit, proposed that Starks use an ambulatory device. (*See* AR 764, 769; *see also* AR 1212, 1562, 1568). This is notable given the medical evidence spans several years with many medical providers mentioned in the record. The ALJ reasonably made note of these outlier assessments and deduced that a cane was not necessary for Starks.

To support this conclusion, the ALJ's decision compared the physical therapist's (Jacobs) assessment with orthopedic specialists who declined to support Starks's use of an ambulatory device. (*See* AR 764). Further, the ALJ noted that in February 2022, one orthopedic physician who was familiar with Starks's back and neck issues, questioned why Starks was using a cane, noting the issues were "nonsurgical". (AR 766 (quoting AR 1540)). Starks argues that the ALJ engaged in a "double-reduction" of Jacobs's assessment, who doubted Starks's earnestness during the assessment since his attestations did not always align with his behavior. (ECF 21 at 18; *see* AR 1212). This argument seemingly relies on Starks's belief that because Jacobs's assessment qualified Starks as meeting sedentary work arrangements—and the ALJ's decision criticized the assessment, instead qualifying Starks for light work—that the ALJ improperly engaged in a double-reduction. (*Id*.). Not so. The ALJ weighed the conflicting medical evidence and decided that Starks's self-reported cane use, along with the two medical opinions supporting

---

[15] *See Angeli v. Saul*, No. 14-cv-01452-SCD, 2020 WL 4040346, at *2 (E.D. Wis. July 17, 2020) (Finding the ALJ's assessment of the claimant's inconsistent statements permissible, the court stated: "The ALJ did mention the inconsistent statements. . . but in doing so he didn't question Angeli's character or overall truthfulness. Rather, he appropriately determined that Angeli's complaints of disabling symptoms were inconsistent with evidence in the record . . . ." (internal citation omitted)).

cane use, were not persuasive in light of weightier evidence indicating cane use was not a medical necessity. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("Weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do." (citation omitted)). As defense counsel cogently argued, "Ms. Jacobs's opinion, even though she purportedly assessed greater functioning than Plaintiff demonstrated on exam, was not consistent with the broader record." (ECF 27 at 14); *see Desotelle v. Kijakazi*, No. 22-1602, 2023 WL 4146246, at *2 (7th Cir. 2023) ("In weighing the persuasiveness of a medical opinion, the most important factors an ALJ considers are the opinion's supportability and consistency with the record." (citation and internal quotation marks omitted)).

The ALJ's assessment of Dr. Parker's opinion is similar. Dr. Parker recommended that a cane was necessary, however, the ALJ found this determination was not supportable given that Dr. Parker did not offer any specific opinion regarding work related abilities or limitations, except for the cane being a medical necessity. (AR 769; *see* AR 1562, 1568). The ALJ determined this evidence was suspect as it was a one-time appointment, inconsistent with the greater record, and lacked reasoning as to how Dr. Parker arrived at this determination. (AR 769, 1562).[16] The ALJ's articulation in the decision is sufficient as it effectively grapples with the medical professionals' inconsistent findings, in light of the larger record. It is true that "an ambiguous opinion [from a medical provider] or evidence about the need for an assistive device may require follow up [from the ALJ]." *Collett-Brown,* 2020 WL 1685717, at *8 (citations omitted). Here, however, the ALJ properly confronted the evidence pertaining to the need of an

---

[16] Because the ALJ weighed Dr. Parker's opinion against the overwhelming evidence conflicting with Starks's alleged need for a cane, the ALJ was not necessarily required to seek more information from Dr. Parker. *See cf. Barnett*, 381 F.3d at 669 (finding that the ALJ improperly concluded that a medical provider's opinion was inconsistent with the record—failing to give effect to a decade's worth of treatment records—and should have, instead, sought clarity from the medical provider). Here, however, the ALJ has pointed to medical records from providers over several years who declined to suggest Starks needed a cane, along with one who specifically questioned why Starks used a cane.

ambulatory device, including Jacobs's and Dr. Parker's opinions, found inconsistencies, and then resolved the conflicts. *See id.*; *see also Vrooman v. Kijakazi*, No. 20-2939, 2021 WL 3086196, at *2 (7th Cir. July 21, 2021) (explaining that when the ALJ is presented with conflicting medical opinions, the ALJ has "the duty to resolve that conflict"); *Sanders v. Colvin*, 600 F. App'x 469, 470 (7th Cir. 2015) ("But an ALJ's job is to weigh conflicting evidence, and the loser in such a process is bound to believe that the finder of fact should have been more favorable to his cause."). The Court can ask no more of the ALJ. *See Vrooman*, 2021 WL 3086196, at *2 ("Even if reasonable minds could differ on the weight to give the conflicting records, [the Court] will not substitute the ALJ's judgment with [its] own." (citations omitted)).

## 2. Impairments in Combination

Starks also argues that the ALJ failed to consider his "impairments in combination" in excluding the cane from the RFC. (ECF 21 at 11; *id*. at 18-20). In support, Starks identifies blood-clot related problems, pulmonary embolism ("PE"), and mental issues that he claims the ALJ failed to include in the decision. (*See* ECF 21 at 18-20). In support of the blood-clot argument, Starks contends that the ALJ should have considered how this condition could underscore his "general frailty and extent of his needed maintenance." (*Id*. at 18). Regarding the PE argument, Starks cites a medical treatise indicating that "those with unprovoked PE should be considered for indefinite anticoagulation with routine follow-ups to assess ongoing benefit." (*Id*. at 19).  Finally, as it pertains to mental issues, Starks argues that "Plaintiff's interrelated mental health issues, even if deemed 'non-severe,' overlap with Plaintiff's host of other conditions, not least of which include chronic pain." (*Id*. at 20). Furthering this argument, Starks argues that "chronic pain may appear out of proportion to identifiable physical processes." (*Id*.).

However, Starks "does not offer any evidence to show that the combination of h[is] impairments caused further limitations than what the ALJ provided." *Lovatto v. Saul*, No. 1:19-cv-00498 TLS-SLC, 2020 WL 7481688, at *8 (N.D. Ind. Oct. 30, 2020). The burden of proof lies with Starks to show that his impairments, alone or in combination, cause further restrictions and limitations. *See id.* Starks's averments in support of the conclusion that blood clots, PE, and mental health conditions should weigh in favor of his use of a cane are dubious. Several medical professionals assessed Starks's medical history, and the vast majority did not recommend cane use. Further, the two professionals who did propose a cane do not appear to account for any of Starks's aforementioned conditions in arriving at their conclusions. (*See* AR 1212, 1562).

Considering the fact that Dr. Parker's and Jacobs's opinions conflict with years of medical evidence from other medical professionals, that the ALJ made a reason-based assessment regarding Starks's inconsistent use of the cane, that the durational period is not met here, and the fact that the Court shall not reweigh the evidence, the ALJ's decision to exclude the need for a cane from the RFC will not be disturbed. *See Clifford*, 227 F.3d at 869.

### 3. Limited Neck Movement and Hand Issues

Starks's second argument on appeal is that the ALJ erred when he failed to include in the RFC the need for limitations on the ability to look up and down, citing his neck mobility issues. (ECF 21 at 21-22). He also mentions hand issues. (*Id.* at 22). For example, he allegedly, "drops money 'all the time' . . . because he cannot feel his finger tips." (*Id.* (citation omitted); *see* AR 206).

In assessing the RFC, "the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7 (footnote omitted). Courts in this circuit have found that the ALJ failed

18

to properly assess neck mobility where the ALJ did not identify the exact medical evidence to substantiate the ALJ's belief about the plaintiff's functional capacity. *See e.g., Stroud v. Berryhill*, No. 2:17-cv-00067, 2018 WL 4501674, at *3 (N.D. Ind. Sept. 19, 2018) [17]; *see also Trevino v. Colvin*, No. 15 C 7818, 2016 WL 7049056, at *7 (N.D. Ill. Dec. 5, 2016) ("Nevertheless, the ALJ's RFC contains no limitations related to Plaintiff's neck mobility. Indeed, the ALJ's analysis contains no explanation as to why any neck-related restrictions were not included in the RFC." (citation omitted)).

However, courts in this circuit have also opined on ALJs' proper assessment of a claimant's purported neck limitations. *See e.g., McMillan v. Saul*, No. 1:18-cv-00110-HAB, 2019 WL 4187632, at *3 (N.D. Ind. Sept. 3, 2019) ("The ALJ stated that, despite Plaintiff['s] reports of joint, neck and low back pain, her longitudinal treatment records revealed good strength and range of motion."). The Seventh Circuit Court of Appeals characterized an ALJ's decision to not include neck pain in the RFC as a "thornier" issue but, nonetheless, deferred to the ALJ's decision where the ALJ "*did* consider [the claimant's] neck problems: [the ALJ] listed them as a serious impairment, mentioned her testimony about her recent MRIs, and acknowledged her testimony that reading a newspaper or going on the computer can aggravate her neck pain." *Green v. Saul*, 781 F. App'x 522, 528-29 (7th Cir. 2019).

Here, the ALJ discussed the impetus of Starks's neck pain—the December 2017 car accident, stating:

> [A] thoracic spine x-ray revealed only minimal levoscoliosis centered at the midthoracic spine with only mild associated multilevel degenerative endplate spurring. Moreover, the claimant's lumbar spine imaging was unremarkable. Finally, the cervical spine imaging showed only mild degenerative endplate spurring at C5-C6, and did not reflect an acute spine fracture or dislocation.

---

[17] In *Stroud*, the plaintiff's long-time doctor opined in treatment notes that the plaintiff "had neck flexion of about 5 degrees and neck extension of about 5 degrees . . . . consistent with the findings of [another doctor], who was unable to perform range of motion testing in the Plaintiff's cervical and lumbar spine due to her extreme pain." *Id*.

(AR 759; *see* AR 433, 435, 437). The ALJ chronicled Starks's neck related issues, including medical opinions from specialists, through 2022. (AR 759-72). For example, the ALJ mentioned a July 2018 primary care visit where Starks admitted to neck pain that radiated to his shoulders, and was then referred to physical therapy. (AR 759-60; *see* AR 600-01). The ALJ also noted a November 2018 doctor's appointment, where lumbar x-rays were normal,[18] but Starks showed "spondylosis in the cervical and thoracic spine." (AR 760; *see* AR 670). The ALJ reported that in December of 2018, an MRI showed "multilevel disc uncovertebral and facet degenerative changes of the cervical spine, multilevel foraminal narrowing up to severe in degree, but no spinal canal narrowing." (AR 760; *see* AR 656). Yet, as has been previously discussed in this Opinion, Starks chose to not undergo recommended surgery, citing dental issues as a reason. (AR 758-59; *see* AR 814-15). An August 2019 medical assessment showed Starks's upper extremities and hands were at a 5/5 strength level. (AR 762, 734).[19] During this appointment, a provider discussed possible cervical epidural injections, but Starks refused this too, as he does not like needles. (AR 759, 762; *see* AR 735). The ALJ noted an x-ray of Starks's spine again showed spondylosis, but that Starks had delayed the recommended surgery. (AR 762; *see* AR 735).

The ALJ noted that in November 2019 a medical appointment showed that Starks had normal reflexes, sensation, and range of motion throughout his upper and lower extremities, yet imaging still showed spondylosis. (AR 763; *see* AR 668-70).[20] Moving forward to a July 2020 appointment pertaining to Starks's spinal pain, the ALJ remarked that strength was 4/5 in Starks's

---

[18] The physician's notes described Starks's results as showing "no instability on flexion and extension films". (AR 670).

[19] Upper-body muscle strength, including grasp and pinch, was found to be a 5/5 in December of 2018. (AR 760).

[20] The ALJ stated that this appointment occurred on November 8, 2018, but the medical record indicates the appointment was held on November 26, 2018). (AR 763; *see* AR 668-70).

upper and lower extremities while reflexes and sensation were normal. (AR 763; *see* AR 1499). The ALJ also noted that in August of 2020 Starks had reduced range of motion, tenderness, and spasms in the spine. (AR 764; *see* AR 1261).

Of note, the ALJ also discussed a physical therapist's evaluation, wherein the physical therapist questioned the severity of Starks's upper-body mobility. To reiterate, at a September 2020 physical therapy appointment Starks demonstrated that he could not rotate his arms behind his head and back, but was seen rubbing the back of his neck and pulling up his pants by reaching to his back when done without request. (AR 764; *see* AR 1212). The physical therapist documented that Starks did not appear to give full effort during the examination. (AR 1212.)

The ALJ also summarized statements from a February 2021 pain management appointment, where the provider noted Starks's failure to attend a pain psychology appointment, failure to begin recommended physical therapy, and failure to schedule a surgery date. (AR 764-65; *see* AR 1250). As of December 2021, Starks still reflected 4/5 strength in his upper body. (AR 765; *see* AR 1526-27). The ALJ also noted that an April 2022 medical appointment with a state agency doctor found Starks's cervical and lumbar range of motion was limited, but the ALJ did not critique this particular point within the medical opinion. (AR 769; *see* AR 1556-69).[21]

Starks argues that the ALJ failed to account for pain management visits in 2019 where providers found Starks's range of motion in his neck and lumbar spine was limited in all directions due to stiffness. (ECF 21 at 22; *see* AR 699, 704, 708). However, the RFC need not "expressly include a limitation related to [his] inability to . . . look [up and] down" so long as the ALJ seriously considers the claimant's neck problems—through the entire record—when creating the RFC. *Green*, 781 F. App'x at 528-29. Here, the ALJ sufficiently analyzed the record

---

[21] The ALJ did discount this doctor's opinion regarding Starks's cane use, as previously discussed herein. (AR 769).

in creating the RFC—considering Starks's personal account of his neck issues,[22] along with findings from medical professionals. *See id*.

The ALJ also took into account findings involving Starks's purported hand deficiencies, where providers largely indicated Starks had 5/5 or 4/5 hand strength. (*See e.g*., AR 762, 766). The ALJ cited a medical opinion from August 2019, finding that Starks displayed 5/5 finger abduction, pincer strength, and grip strength. (AR 762; *see* AR 734). Similarly, during a December 2021 medical appointment, Starks displayed 4/5 finger abduction, pincer strength, and grip strength. (AR 765; *see* AR 1527). The ALJ opined on evidence indicating Starks demonstrated normal sensation. (AR 760, 762-63). Further, two reviewing state agency physicians, Dr. Corcoran and Dr. Brill, found that Starks had no manipulative limitations. (AR 175, 205-06). The ALJ mentioned Starks's MRIs, indicating spondylosis in the cervical and thoracic spine, and also noted Starks's testimony that he cannot play video games for more than ten minutes. (*See* AR 753). The ALJ also noted Dr. Parker's finding in April 2022 that Starks showed reduced manipulative functioning in his hands but also noted that the provider did not specify the degree to which Starks could not engage in activities. (AR 769; *see* AR 1559, 1564). That same month the record also indicates that another physician, Dr. Sands, found Starks did have manipulative limitations, however, the ALJ found Dr. Corcoran and Dr. Brill's opinions more persuasive because they were "more consistent with the longitudinal clinical and objective evidence, [Starks's] poor compliance with treatment, and [Stark's] lack of interest in available treatment options such as surgery." (*See* AR 771-72; *see also* AR 913-14). Taking the record

---

[22] The ALJ decision notes "[t]he claimant can care for his own personal need[s] and play video games for a short time, and the evidence does not establish that he is unable to use both upper extremities to the extent required by the listing." (AR 757).

wholistically, it is reasonable for the ALJ to have concluded that Starks did not have hand limitations requiring inclusion into the RFC. *See Vrooman*, 2021 WL 3086196, at \*2.

Inconsistencies in the severity of Starks's injuries were also considered in assessing Starks's flexion capabilities. Starks argues that a doctor found that he could not bend over and not lift anything over twenty pounds. (ECF 21 at 21-22; *see* AR 430). However, Starks's evidence is from December of 2017 while later evidence, in which the ALJ relied, found that Starks could perform light work—including occasionally climbing ramps and stairs, stooping, kneeling, crouching and crawling. (AR 771-72; *see* AR 174-77, 204-05). The ALJ relied on the reports of Dr. Corcoran and Dr. Brill, dated May 2019 and August 2019, respectively, who both concluded that Starks could perform light work with occasional stooping, kneeling, crouching, crawling, and climbing ramps and stairs, but no climbing of ladders, ropes or scaffolds. (AR 174-75, 203-04). The ALJ relied on these opinions in finding that Starks should avoid concentrated exposure to extreme cold, wet, slippery, moving, or uneven surfaces; and working in close proximity to heavy machinery and unprotected heights. (*See* AR 757; *see also* AR 175, 205). The ALJ thoroughly considered Starks's neck and hand complaints and Seventh Circuit precedent supports the ALJ's decision to exclude any neck and hand limitations in the RFC. *See Green*, 781 F. App'x at 528-29; *see also Hunter v. Barnhart*, 56 F. App'x 262, 265 (7th Cir. 2003). Therefore, Starks's second argument is also unavailing.

### D. Mental RFC

Starks's next argument is that the ALJ erred when excluding his mental limitations in the RFC, thus failing to build a logical bridge from the evidence to the conclusion related thereto. (ECF 21 at 22). According to Starks, the ALJ was required to account for his supported mental limitations in the RFC. (*Id*. at 23). Notably, Starks relies on medical opinions from Leslie

Predina, Ph.D., and Amanda Mayle, Psy.D., HSPP. (*Id.* at 24-27; *see* ECF 21 at 24-27). Dr.

Predina offered an opinion supporting mental impairment, stating, in relevant part:

> [Starks's] ability to sustain his concentration and persistence appeared to be
> impaired. He would likely have a few problems being able to concentrate and
> persist on his job responsibilities . . . . Mr. Starks appears to be experiencing
> symptoms consistent with Generalized Anxiety Disorder. He may struggle to
> get along with his supervisors and coworkers due to his mental issues.

(AR 681; *see* AR 754). The ALJ critiqued Dr. Predina's opinion, finding it "not fully persuasive

or supportable" because it failed to use defined terms such as "mild, moderate, frequent,

occasional" to qualify the degree of Starks's mental limitation. (AR 754; *see* AR 678-81). The

ALJ further questioned Dr. Predina's opinion that Starks might struggle to get along with others,

finding it both "speculative and inconsistent with the cooperativeness on this examination[], and

the claimant's own reports that he had five friends and 'generally gets along well with others . . .

.'" (AR 754-75; *see* AR 679, 681). The ALJ also relied on evidence from several other medical

examinations—consistently finding that Starks had normal mental exams. (AR at 755; *see e.g.*,

AR 761-63, 765, 769).

   The second medical opinion comes from Dr. Mayle, who diagnosed Starks as having

Generalized Anxiety Disorder and Panic Disorder Without Agoraphobia. (AR 1574). On a

mental status exam, Dr. Mayle found that Starks's thought content included overvalued ideas,

obsessions, and preoccupations. (AR 1572). Starks argues that these facts should have caused the

ALJ to include mental limitations in the RFC. (ECF 21 at 26-28). The ALJ commented on Dr.

Mayle's findings, stating as follows:

> This source did not offer any specific opinion regarding work related
> abilities or limitations. However, the findings on exam, the lack of any
> significant mental health treatment, reported activities such as playing
> chess, reading, handling financial accounts, and maintaining multiple
> friendships, educational record, and longitudinal normal mental exams

during treatment all support a finding that mental impairments are not severe.

(AR 770-71; *see* AR 679).

Salient to this issue, neither Seventh Circuit precedent, nor the social security regulatory scheme, articulate that the ALJ is required to include non-severe limitations in the RFC. *See Hansford v. Saul*, No. 18-cv-607-slc, 2019 WL 4727771, at *2 (W.D. Wis. Sept. 27, 2019) ("The regulations and case law say that the ALJ must *consider* the limitations posed by the claimant's severe and non-severe impairments. They do not say that the ALJ must always *include* non-severe limitations in the RFC."); *see also Keys v. Colvin*, No. 1:14-CV-250, 2016 WL 447519, at *8 (N.D. Ind. Feb. 5, 2016) ("Because the ALJ did not find that the medical evidence supported Keys's alleged limitations, she did not need to include those limitations in her RFC or VE hypothetical.").[23] "[W]here the ALJ builds a logical bridge between the evidence and his decision to omit non-exertional mental limitations from the ultimate RFC finding, remand is not required." *Hansford*, 2019 WL 4727771, at *2 (collecting cases).

Here, the ALJ effectively connected his decision to the underlying evidence. The ALJ acknowledged that all of Starks's severe and non-severe impairments required consideration in deciding their inclusion into the RFC. (AR 749). Next, the ALJ found that Starks's medically determinable mental impairment of anxiety disorder did not cause more than minimal limitation in Starks's ability to perform basic mental work activities and was therefore non-severe. (AR

---

[23] The Seventh Circuit Court of Appeals affirmed this Court's decision, reasoning: ["o]nce the ALJ decided not to credit Keys's testimony that pain limited his ability to concentrate, she did not err in her assessment of his residual functional capacity when she imposed no limitation on his concentration." *Keys v. Berryhill*, 679 F. App'x 477, 482 (7th Cir. 2017). Therefore, Starks's reliance on cases such as *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014), and *Etherington v. Saul*, No. 1:19-cv-00475-JVB-JPK, 2021 WL 414556, at *5 (N.D. Ind. Jan. 21, 2021), is misapplied. (*See* ECF 21 at 23). In those cases, the ALJ's decisions were remanded because the ALJ failed to consider the entire record, which does not appear to be the case here.

752).[24] As previously discussed, the ALJ then relied on evidence indicating that Starks was able to get along with others, had several normal mental exams, played chess, read, and handled his financial accounts. (AR 679; *see* AR 754, 770-71, 761-63, 765, 769; *see also* AR 601, 1247, 1498, 1527). The ALJ also cited a state agency doctor's opinion that Starks had mild or less limitation in the paragraph B criteria. (AR 755; *see* AR 166-78, 179-91).[25] Additionally, other providers found that Starks's anxiety was non-severe. (AR 755; *see* AR 194-225; *see also* 889-95, 908-16). After explaining why Starks only had, at most, mild limitations in the paragraph B criteria, the ALJ explained:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(AR 756). The ALJ's decision illuminated an important distinction between consideration of Starks's RFC and whether his mental impairments were severe. *See Hansford*, 2019 WL 4727771, at 3 ("[T]the ALJ recognized that he needed to consider Hansford's RFC separately

---

[24] Starks has also been diagnosed as having a panic disorder. (AR 1573-74). Although the ALJ did not explicitly mention this disorder when concluding that Starks's mental impairment did not cause more than a minimal limitation, the ALJ elaborated on Starks's panic and anxiety attacks in explaining his findings. (*See* AR 751).

[25] The Paragraph B criteria are described as follows:

> We rate the degree of functional limitation in four broad areas of mental functioning:
>
> - Understand, remember, or apply information;
> - Interact with others;
> - Concentrate, persist, or maintain pace; and
> - Adapt or manage oneself.
>
> These four areas of mental functioning are commonly referred to as the 'paragraph B criteria.'

20 C.F.R. Pt. 404, Subpt. P, App. 1.

from the issue of whether her mental impairment was severe.”). Lastly, the ALJ implied that Starks can maintain adequate concentration, attention, and pace.[26] Accordingly, the ALJ did not err in deciding to exclude Starks's non-severe mental impairments from the RFC and the hypotheticals to the VE.

*E. Due Process*

Starks's last argument involves an alleged procedural due process violation on the part of the ALJ—regarding comments made by the ALJ during the second hearing, along with the ALJ's written decision. (ECF 21 at 29-31).

At the outset of this Court's discussion on the due process issue, it is important to note that even troublesome comments by the ALJ do not necessarily give rise to a remand. *See Spicher v. Berryhill*, 898 F.3d 754, 756 (7th Cir. 2018). The Supreme Court and the Seventh Circuit of Appeals have stated that a court should remand for a new hearing only if the decisionmaker ‘“displayed deep-seated and unequivocal antagonism that would render fair judgment impossible.”’ *Id.* (citation omitted); *see Liteky v. United States*, 510 U.S. 540, 556 (1994).

Starks argues that the ALJ prejudged the case. According to Starks, the ALJ's prejudgment is evidenced through the ALJ's statements assuming Starks did not need a cane and was not mentally impaired. (ECF 21 at 28-31). Starks's first argument is that the ALJ assumed Starks did not need a cane until February of 2019. Specifically, at the beginning of the second hearing, the ALJ stated:

---

[26] The ALJ opined on Starks's reported activities such as playing chess, reading, handling financial accounts, and maintaining multiple friendships. (*See* AR 770-71); *see also Hansford*, 2019 WL 4727771, at 3 (“Although the ALJ didn't come out and say it, the import of this evidence is that Hansford was able to maintain concentration, attention and pace to take college classes and to handle being around others.”). Accordingly, Starks's argument that the ALJ failed to account for issues with concentration, persistence, and pace is without merit. (*See* ECF 21 at 25).

> The remand was warranted on the basis of a cane use. The [district] court felt that the need of a cane should've been included within the hypothetical. That being said, the alleged onset date was December of '17. The injury that occurred requiring the use of a cane was February of 2019, so more than a year later. And, the records at the time of the decision that we had only extended [until] mid-2019, so therefore, there was only less than – I think it was about six months' worth of documentation that would've indicated the use of a cane at the time the decision was issued . . . .

(AR 786). Starks suggests that the purpose of the ALJ's comment was to indicate Starks's alleged need for a cane was not supported by twelve months of evidence. *See* 20 C.F.R. §§ 404.1509, 416.909. The ALJ's comment is peculiar given that at this point in the hearing the ALJ had not yet asked Starks when his need for a cane occurred—but later confirmed Starks's need for a cane initiated in 2019. (*See* AR 794). Yet, a reasonable explanation is that the ALJ observed Starks's medical records did not indicate gait issues until after his knee injury in February 2019.[27] Later in the hearing the ALJ specifically asked whether Starks needed a cane prior to his 2019 knee injury, and how often Starks relied on the cane, given some medical records showed that he walked fine. (*Id.*). The ALJ's remarks "do not in themselves show that the ALJ breached his duty to develop the record fully and fairly" as the record adequately indicates the ALJ did not rely on attenuated assumptions, but rather, asked direct questions to seek clarity. *Williams v. Chater*, 915 F. Supp. 954, 961 (N.D. Ind. 1996).[28]

---

[27] The ALJ's decision states "the ONE notes do not reflect ongoing gait abnormalities through December 2018. Thus, in finding that a cane is necessary, the undesigned would have to largely rely upon knee issues that did not begin until an injury on February 11, 2019, when [Starks] had a slip and fall." (AR 766-67).

[28] Starks also argues that the ALJ engaged in improper character attacks in asking questions about Starks's need for a cane. (ECF 21 at 30). Certainly, "administrative law judges aren't in the business of impeaching claimants' character[, however] administrative law judges will . . . assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole*, 831 F.3d at 412. Here, the ALJ's line of questioning was not a character attack, but rather, a reasonable inquiry into Starks's alleged need for a cane, given the lack of medical evidence supporting Stark's usage. *See Sherlyn M. v. Saul*, 408 F. Supp. 3d 931, 950 (S.D. Ind. 2019) (Dismissing claimant's discreditation argument given "the Court has already detailed numerous, specific reasons that the ALJ provided for discounting [claimant's] credibility. Accordingly, the Court declines to provide any extended analysis that would be redundant and concludes that the ALJ's subjective symptom evaluation was not patently wrong.").

Another contention, on the part of Starks, concerns the ALJ's decision to not include mental impairments in the RFC while "go[ing] off on a tangent emphasizing that non-severe impairments need not reach the RFC." (ECF 21 at 31 (footnote omitted)). According to Starks, the ALJ erred because "prejudging that mental health impairments do not go in the RFC goes hand in hand with prejudging that every last lack of diligence / wisdom in treatment should strictly discredit Plaintiff." (*Id*.). The Court is not persuaded. "[T]he ALJ only was required to incorporate [in the RFC] those limitations supported by the medical evidence." *Keys v. Colvin,* 2016 WL 447519, at *8.* The ALJ did so here, and the Court will belabor this issue no longer. Accordingly, Starks's due process allegations "fall short of the high bar required for a new hearing." *Spicher*, 898 F.3d at 756.

Based on the foregoing reasons, the decision of the Commissioner is AFFIRMED.

SO ORDERED.

Entered this 18th day of March 2025.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge